Jay M. TIMMONS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 12A04–9904–CR–165.

Court of Appeals of Indiana.

Feb. 7, 2000.

Richard D. Martin, Miller & Martin, Frankfort, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, James B. Martin, Deputy Attorney General, Indianapolis, Indiana, Attorneys For Appellee.

## OPINION

BROOK, Judge

### Case Summary

Appellant-defendant Jay M. Timmons ("Timmons") appeals from the trial court's denial of his motion to suppress evidence, his petition for judicial review of the chemical breath test refusal determination, and his motion to dismiss the State's charge of driving while suspended as a Class D felony.

We affirm in part and reverse in part.

### Issues

Timmons presents three issues for our review, which we restate as the following four:

(1) whether the telephonic arrest warrant was defective for failure to comply with IND.CODE § 35–33–5–8;

(2) if so, whether the trial court erred when it denied Timmons' motion to suppress evidence obtained following a warrantless arrest inside his home;

(3) whether the trial court erred in finding that Timmons refused to submit to a chemical breath test; and

(4) whether the trial court erred when it denied Timmons' motion to dismiss the State's charge of driving with a suspended license.

### Facts and Procedural History

On the evening of May 10, 1998, Officer Robert Mitchell ("Officer Mitchell") of the Frankfort Police Department received a dispatch regarding two hit-and-run accidents: one that had occurred in the 300 block of Alhambra Avenue and a second that had occurred at the intersection of Second Street and Freeman. Upon his arrival on the scene, Officer Mitchell was informed by several witnesses that Timmons had been the driver of the hit-and-run vehicle now parked in front of his Second Street residence. One of the witnesses was Sandy Cornett, a neighbor who lived across the street from Timmons and with whom Officer Mitchell was familiar. Officer Mitchell determined that the car parked in front of Timmons' residence matched the description given to him by the dispatcher and observed property damage to the car consistent with damage reported from the two accident sites. Shortly thereafter, Timmons' sister arrived on the scene and confirmed that Timmons was inside his house and refusing to come out.

Officer Mitchell then arranged a three-way telephone call between himself, the police dispatcher, and Clinton Superior Court Judge Kathy R. Smith ("Judge Smith"). During the tape recorded conversation, Officer Mitchell testified under oath to the facts surrounding the hit-and-run accidents and that in light of the witness statements, matching vehicle descriptions, and property damage, he had probable cause to suspect Timmons as the driver. The colloquy between Judge Smith and Officer Mitchell concluded as follows:

JUDGE SMITH: O.K. Then ah, I'll issue an arrest warrant for his arrest, I'll go ahead and sign it and ah you'll need to have it in hand, you have probable cause to arrest, well I'm sorry, one step ahead Bob. This Freeman Street the address we're talking about is in Clinton County, Indiana, is that correct?

OFFICER: That's correct.

JUDGE SMITH: You have probable cause to arrest, to go in the house and arrest ... Mark J. Timmons [*sic*] for leaving the Scene of an Accident Count one and Leaving the Scene of an Accident Count two and then any other crimes [that] ... would follow from that, O.K.?

OFFICER: O.K.

JUDGE SMITH: And let's put his bond at ten thousand dollars, O.K.

OFFICER: O.K.

JUDGE SMITH: And you don't physically have to have that [arrest warrant]. I'll also call the jail and tell them I've authorized the arrest.

Thereafter, police officers entered Timmons' residence through an unlocked door, found Timmons hiding in a closet, and arrested him. After Timmons was placed in the front seat of a patrol car, Officer Jason Albaugh ("Officer Albaugh") of the Frankfort Police Department asked him to submit to a portable breath test, which Timmons declined. At the book-in counter of the jail, Officer Albaugh requested that Timmons take a chemical breath test on the department's BAC datamaster; Timmons again declined. In his alcohol influ-

ence report, Officer Albaugh noted Timmons' refusal to submit to any sobriety tests as well as his odor of alcohol, bloodshot eyes, and unsteadiness.

Timmons was charged with multiple counts arising out of this incident, including one count of operating a vehicle while intoxicated as a Class D felony,[1] one count of driving with a suspended license as a Class D felony,[2] and two counts of failure to stop after an accident as Class A and B misdemeanors, respectively.[3] In addition, Judge Smith[4] found probable cause to believe Timmons had refused to take a chemical breath test, a determination that would result in further suspension of Timmons' driving privileges.

On December 2, 1998, Timmons moved to suppress "any evidence ... resulting from the warrantless arrest," contending that the telephonic warrant was invalid and that as such, the officers' arrest inside his home was illegal. The trial court denied Timmons' motion to suppress, finding that although the arrest warrant was defective, it was not fatally so. Timmons subsequently petitioned the trial court to review Judge Smith's chemical breath test refusal determination, and also moved to dismiss the charge of driving while suspended, both of which the court denied. Timmons now appeals.[5]

## Discussion and Decision

### I. Telephonic Arrest Warrant

■ Timmons contends that the telephonic arrest warrant was defective because it did not comply with IND.CODE

---

1. *See* IND.CODE § 9–30–5–3 (previous conviction within preceding five years).

2. *See* IND.CODE § 9–24–18–5.

3. *See* IND.CODE § 9–26–1–1 (duties of driver following collision resulting in injury or death) and 9–26–1–3 (duties of driver following collision with unattended vehicle).

4. Timmons filed a motion for change of judge on December 2, 1998, naming Judge Smith as a potential witness with respect to the issue of the validity of the telephonic arrest warrant. Judge Smith granted Timmons' motion for

change of judge on December 11, 1998, and appointed Judge Linley E. Pearson to replace her.

5. The trial court certified the issues raised in Timmons' motion to suppress and motion to dismiss for interlocutory appeal. This Court granted Timmons' request that the interlocutory appeals be consolidated under the instant cause number with the direct appeal from the trial court's denial of his petition for judicial review of the chemical breath test refusal determination.

§ 35–33–5–8, which outlines the procedure for establishing probable cause orally or by telephone. We agree. IND.CODE § 35–33–5–8 provides in relevant part:

(a) A judge may issue a search or arrest warrant without the [probable cause] affidavit required under section 2 of this chapter, if the judge receives sworn testimony of the same facts required for an affidavit . . .

 (2) orally by telephone or radio[.] . . .

(b) After reciting the facts required for an affidavit and verifying the facts recited under penalty of perjury, an applicant for a warrant under subsection (a)(2) shall read to the judge from the warrant form on which the applicant enters the information read by the applicant to the judge. The judge may direct the applicant to modify the warrant. If the judge agrees to issue the warrant, the judge shall direct the applicant to sign the judge's name to the warrant, adding the time of issuance of the warrant. . . .

(d) If a warrant is issued under subsection (a)(2), the judge shall record the conversation on audio tape and order the court reporter to type or transcribe the recording for entry in the record. The judge shall certify the audio tape, the transcription, and the warrant retained by the judge for entry in the record. . . .

(f) The court reporter shall notify the applicant who received a warrant under subsection (a)(2) . . . when the transcription or copy required under this section is entered in the record. The applicant shall sign the typed, transcribed, or copied entry upon receiving notice from the court reporter.

The telephonic warrant provisions were intended to encourage the procurement of warrants in situations involving exigent circumstances, when a warrant might not otherwise be sought. *Cutter v. State*, 646 N.E.2d 704, 712 (Ind.Ct.App.1995), *trans. denied.*

■ Our review of the record establishes that none of the requirements identified in IND.CODE § 35–33–5–8 were complied with, save the requirements that Officer Mitchell testify under oath and that his conversation with Judge Smith be recorded. Officer Mitchell did not read from a warrant form as required by the statute, nor did Judge Smith advise Officer Mitchell to affix her signature to the warrant. Indeed, it appears that no warrant was ever issued in this case, either before or after Timmons' arrest, and neither the judge nor Officer Mitchell certified the audio tape and transcription of their conversation. Moreover, the transcript was never made part of the record until it was admitted into evidence at the suppression hearing eight months later.

While in the past we have declined a defendant's "invitation to elevate form over substance," we have done so only after concluding that "the taping of the telephonic probable cause hearing was in *substantial compliance* with IND.CODE § 35–33–5–8." *Id.* (emphasis added). In *Cutter*, we held that the telephonic search warrant was valid despite belated certification and attestations, because the goals IND.CODE § 35–33–5–8 was intended to insure were still met. *Id.* at 713. Here, however, there was a near total failure to comply with the procedures set out in IND. CODE § 35–33–5–8; there was no warrant form, signature, certification, or attestation, belated or otherwise. Accordingly, we conclude that the telephonic arrest warrant in this case was defective, and should more appropriately be characterized as nonexistent.

## II. Motion to Suppress

■ Nevertheless, our determination of this issue does not require us to reverse the trial court's denial of Timmons' motion to suppress. Initially, we concede that arresting Timmons inside his home without a valid arrest warrant violated his rights under the Fourth Amendment of

the United States Constitution.[6] *See Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (Fourth Amendment prohibits police from making warrantless and nonconsensual entry into suspect's home in order to make routine felony arrest even when police have probable cause to do so). Indeed, "[t]here is no question that police are required by the federal constitution to obtain a warrant to arrest a suspect who hunkers down inside his home and refuses to leave or answer the door." *Cox v. State*, 696 N.E.2d 853, 858 (Ind.1998). This rule, however, is not a "per se rule" that automatically renders inadmissible "any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978).

■ Here, Timmons argues that the trial court should have suppressed under the exclusionary rule "any . . . evidence resulting from the warrantless arrest," which includes evidence of his purportedly intoxicated demeanor and the events surrounding his refusal to submit to a chemical breath test. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (fruit of the poisonous tree doctrine). Even assuming Timmons' arrest was executed in violation of his Fourth Amendment rights, the challenged evidence would still be admissible under the Supreme Court's decision in *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). *See also Cox*, 696 N.E.2d at 858–59. In *Harris*, the Supreme Court held that incriminating statements made by a murder defendant following an illegal arrest were not subject to the exclusionary rule:

> Nothing in the reasoning of [*Payton*] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is re-

moved from the house. There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest. . . . Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given Miranda warnings, and allowed to talk. . . . Harris' statement taken at the police station was not the product of being in unlawful custody. Neither was it the fruit of having been. arrested in the home rather than someplace else. . . . The police had a justification to question Harris prior to his arrest; therefore, his subsequent statement was not an exploitation of the illegal entry into Harris' home[.]

*Id.*, 495 U.S. at 18, 110 S.Ct. at 1643.

Likewise, the police officers in the instant case had probable cause to arrest Timmons for twice leaving the scene of an accident, based upon credible witness identification and Officer Mitchell's confirmation of a vehicle description and related property damage. The officers had justification to question Timmons prior to his arrest. The evidence which came to light thereafter, including Timmons' intoxicated demeanor and refusal to submit to a chemical breath test, was not an exploitation of the illegal entry into Timmons' house, nor was it the fruit of having been arrested in his house instead of someplace else. *See id.* "[T]he rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection . . . outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.*, 495 U.S. at 17, 110 S.Ct. at 1643.

Accordingly, because the police had probable cause to arrest Timmons as a suspect in two hit-and-run accidents, the exclusionary rule does not bar the evidence Timmons seeks to suppress, despite

---

6. Timmons does not raise a claim under the Indiana Constitution.

the fact that such evidence was revealed only after an arrest made in violation of the Fourth Amendment. The trial court's denial of Timmons' motion to suppress is affirmed.

### III. Refusal to Submit to Chemical Test

Timmons next challenges the trial court's determination that he refused to submit to a chemical breath test offered by Officer Albaugh. In particular, he claims that he was not properly informed of the consequences of such refusal as required by Indiana's implied consent law, and as such, the license suspension based thereon should be vacated.

Initially, we note that a trial court's denial of a defendant's petition for judicial review of a chemical breath test refusal determination is a final appealable judgment. *See* IND.CODE 9–30–6–10–(g). Our review of this judgment, nevertheless, is limited. *Vetor v. State*, 688 N.E.2d 1327, 1328 (Ind.Ct.App.1997). We can determine only whether the evidence is sufficient as a matter of law to support the trial court's decision, and we will neither reweigh the evidence nor assess the credibility of the witnesses. *Id.* Rather, we will consider only the evidence most favorable to the trial court's determination. *Id.*

Indiana's implied consent law mandates that "[i]f a person refuses to submit to a chemical test, the arresting officer shall inform the person that refusal *will* result in the suspension of the person's driving privileges." IND.CODE 9–30–6–7(a) (emphasis added). In addition, the Bureau of Motor Vehicles is required to suspend the person's driving privileges for refusal to submit to a chemical test. IND. CODE 9–30–6–9(a)(1). Clearly, the language of the implied consent provisions is phrased in absolute terms. *State v. Huber*, 540 N.E.2d 140, 142 (Ind.Ct.App.1989), *trans. denied.* Thus, an arresting officer must adequately convey to the driver the strong likelihood that a suspension of driv-

ing privileges *will* result upon refusal to submit to a chemical test. *Id.*; *Zakhi v. State*, 560 N.E.2d 683, 686–87 (Ind.Ct.App. 1990). Likewise, a defendant's refusal to submit to a chemical test has been deemed insufficient when given following an officer's warning that his license *may* be suspended if he refuses to comply. *See Todd v. State*, 566 N.E.2d 67, 70 (Ind.Ct.App. 1991); *Vetor*, 688 N.E.2d at 1329 `(where officer testified that he informed defendant of implied consent law several times but never testified as to substance of his advisements to defendant, evidence insufficient to support refusal).

Here, Timmons alleges that Officer Albaugh gave him inconsistent implied consent warnings that failed to adequately apprise him of the consequences of refusal. In particular, Timmons refers us to Officer Albaugh's inability to "recall [his] exact words" with respect to the implied consent warning given in his patrol car, as well as to the certification of breath test refusal form signed by Officer Albaugh at the jail which advises, "If you refuse to submit to the test, your license to drive in Indiana *may* be suspended for one year." (Emphasis added). In so doing, Timmons invites us to reweigh the conflicting evidence and assess Officer Albaugh's credibility, tasks not within our prerogative on appeal.

Rather, the record reflects that Officer Albaugh testified he read from his implied consent card both in the patrol car and again at the jail as follows:

> I have probable cause to believe that you have driven a vehicle while under the influence of intoxicating liquor or drugs. Before I can place you under arrest I must offer you a breath test for intoxication to be given by a qualified chemical test operator. If you refuse to submit to the test, your license to drive in Indiana *will* be suspended for one year. Will you submit to a breath test for intoxication?

(Emphasis added). This advisement conveyed the strong likelihood that a suspension of driving privileges would follow Tim-

mons' refusal to submit to a chemical test. *See Zakhi,* 560 N.E.2d at 686–87; *Huber,* 540 N.E.2d at 142. In addition, Officer Albaugh testified that the certification of breath test refusal form containing the word "may" was never read out loud to Timmons and that it was not filled out until after the informed consent card had been read and Timmons had refused to submit to a chemical test. Officer Albaugh further noted that he made Timmons "fully aware that his license would be suspended.... [Timmons] acknowledged that he understood that and ... he still refused."

In viewing the evidence most favorable to the trial court's determination, as we are required to do, we conclude that this evidence was sufficient as a matter of law to support a finding that Timmons refused to submit to a chemical test. Any license suspension based thereon is affirmed.

### IV. Motion to Dismiss

■ Finally, Timmons argues that the trial court erred when it denied his motion to dismiss the State's charge of driving while suspended as a Class D felony. IND. CODE § 9–24–18–5 reads in part as follows:

(a) Except as provided in subsections (b) and (d), a person who operates a motor vehicle upon a highway while the person's driving privilege, license, or permit is suspended or revoked commits a Class A infraction. However, if:

 (1) a person knowingly or intentionally violates this subsection; and

 (2) less than ten (10) years have elapsed between the date a judgment was entered against the person for a prior unrelated violation of this subsection ... and the date the violation described in subsection (1) was committed;

the person commits a Class A misdemeanor.

(b) If:

 (1) a person operates a motor vehicle upon a highway while the person's

 · driving privilege, license, or permit is suspended or revoked; and

 (2) the person's suspension or revocation was a result of the person's conviction of an offense (as defined in IC 35–41–1–19);

the person commits a Class A misdemeanor....

(d) If a person knowingly or intentionally operates a motor vehicle upon a highway while the person's driving privilege, license, or permit is suspended or revoked as a result of a misdemeanor or felony conviction, the person commits a Class D felony. However, the offense is a Class C felony if the operation results in the death of another.

Timmons contends that IND.CODE § 9–24–18–5 is void and unenforceable because subsection (b) and subsection (d) create two different punishments for identical offenses. In particular, subsection (b) makes it a Class A misdemeanor to drive with a license that has been suspended as a result of a previous conviction for an "offense." "Offense" is defined by IND. CODE § 35–41–1–19 as a "crime." "Crime," in turn, is defined by IND.CODE § 35–41–1–6 as "a felony or a misdemeanor." Thus, subsection (b) includes an element identical to an element of subsection (d): a license suspension resulting from a previous "misdemeanor or felony conviction."

The sole ostensible difference between subsections (b) and (d), therefore, appears to be that subsection (d) contains the language "knowingly or intentionally"—the addition of a mental culpability element—where subsection (b) is silent. However, our supreme court held in *State v. Keihn,* 542 N.E.2d 963 (Ind.1989), that even in the absence of a specific statutory reference to the requisite mental state, the State must still prove a defendant's knowledge of the suspension of his license. *Id.* at 968 (interpreting IND.CODE § 9–1–4–52, now repealed); *see also Stewart v. State,* 721 N.E.2d 876, 878–879, 880 (1999) (reaffirm-

ing *Keihn* principle that State must prove knowledge). In light of *Keihn,* both subsection (b) and subsection (d) require the State to establish that a defendant at least "knowingly" operated a motor vehicle while his license was suspended; in this respect, the proof necessary under each subsection is identical, and a defendant could be convicted of either an A misdemeanor or a D felony on the very same evidence. It is only when the State alleges a higher level of culpability, i.e., that the defendant "intentionally" operated a motor vehicle while his license was suspended, that subsection (d) alone is applicable. Under such circumstances, the defendant could be charged with and, if the charges were proven, ultimately convicted of a Class D felony.

 We agree with Timmons' assessment that the driving while suspended statute is inartfully drafted. Nevertheless, it appears that subsections (b) and (d) do differ to the extent that subsection (d) permits the State to prove a defendant "intentionally" operated his motor vehicle while suspended. Thus, we decline to find IND.CODE § 9–24–18–5 void. Rather, we believe the varying penalties found in subsections (b) and (d) render the statute ambiguous. "It is a cardinal rule of criminal justice ... that penal statutes are to be construed against the state and ambiguities therein are to be resolved in favor of the accused." *Pennington v. State,* 426 N.E.2d 408, 410 (Ind.1981). In resolving the conflicting provisions at issue here, we hold that when the State establishes a defendant "knowingly" operated a motor vehicle with a license suspended as a result of a previous felony or misdemeanor conviction, the defendant may be convicted of nothing greater than a Class A misdemeanor. *See Smith v. State,* 675 N.E.2d 693, 696–97 (Ind.1996) (strictly construing penal statute so as to impose lesser of two conflicting presumptive sentences); *Dowd v. Sullivan,* 217 Ind. 196, 27 N.E.2d 82, 85 (Ind.1940) (strictly construing penal statute so as to impose concurrent rather than consecutive sentences). This interpreta-

tion leads to the conclusion that a defendant may be charged with and convicted of D felony driving while suspended only if it is alleged in the information and proven at trial that his conduct rose to the level of intentional.

Here, although the State charged Timmons with driving while suspended as a Class D felony, its information alleged merely that:

> Jay M. Timmons ... operated a motor vehicle while his ... license had been suspended or revoked and the suspension or revocation was a result of the previous conviction of an offense as defined in [IND.CODE § ] 35–41–1–19[.]

As the information is worded, Timmons could not be charged with any crime other than a Class A misdemeanor. In the absence of any allegation regarding Timmons' mental state, and specifically, that Timmons' conduct was intentional, the State's information charging him with a Class D felony was fatally defective. The trial court erred when it failed to dismiss the same.

Accordingly, we reverse the trial court's denial of Timmons' motion to dismiss. In all other respects, the trial court is affirmed.

NAJAM and ROBB, JJ., concur.